Kun Cho (KC4804)
Law Office of Kun Cho LLC
385 Sylvan Avenue, Suite 20
Englewood Cliffs, NJ 07632
(201) 484-8282
Email: kun@kuncholaw.com
Attorneys for Plaintiff

## UNITED STATE DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARLOWE PATENT HOLDINGS LLC, | : Case No. 3:11-cv-07044-PGS-DEA |
| Plaintiff, | : |
| v. | : |
| FORD MOTOR COMPANY, | : **JURY TRIAL DEMANDED** |
| Defendant. | : |

## MARLOWE PATENT HOLDINGS LLC'S
## CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................. 2

   A. Marlowe's '786 Patent. ............................................................................. 2

III.  ARGUMENT ON DISPUTED TERMS ........................................................... 4

   A. CLAIM CONSTRUCTION ........................................................................ 4

      i.  LEGAL STANDARD. .......................................................................... 4

      ii. INTERFACE. ........................................................................................ 4

      iii. DEVICE PRESENCE SIGNAL. ......................................................... 8

   B. MEANS PLUS FUNCTION TERMS ...................................................... 13

      i.  LEGAL STANDARD. ........................................................................ 13

      ii. THE FUNCTIONAL LIMITATIONS. ............................................... 14

      iii. CORRESPONDING STRUCTURE. .................................................. 17

IV.   CONCLUSION. ................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082 (Fed. Cir. 2003)...................................................... 11

*Apex Inc. v. Rarotam Computer, Inc.*, 325 F.3d 1364 (Fed. Cir. 2003)....................................... 11

*Aristocrat Techs. Australia Pty Ltd. V. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008)......... 14

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701 (Fed. Cir. 1997) ........... 4

*Digital Biometrics, Inc. v. Indentix, Inc.*, 149 F.3d 1335 (Fed. Cir. 1998).................................... 4

*Enzo Biochem Inc. v. GenProbe*, 323 F.3d 956 (Fed. Cir. 2002) .................................................. 13

*Ergo Licensing, LLC v. Carfusion 303*, Inc., 673 F.3d 1361 (Fed. Cir. 2012)............................ 14

*Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323 (Fed. Cir. 2008) ...................................... 14

*In re Dossel*, 115 F.3d 942 (Fed. Cir. 1997) .................................................................................. 14

*Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) ................... 4

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 460 F.3d 1377 (Fed. Cir. 2005)............................ 14

*Liebel Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004)........................................ 11

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ......................................... 4

*Medtronic, Inc. v. Adv. Cardiovascular Sys., Inc.*, 248 F.3d 1303 (Fed. Cir. 2001) ................... 14

*Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353 (Fed. Cir. 2005)............................. 8

*Texas Digital Systems Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002)............................ 4

*Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991) ..................................................... 14

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ......................................... 4

## Statutes

35 U.S.C. § 112............................................................................................................................... 4

35 U.S.C. § 112(b) ................................................................................................................... 12, 14

35 U.S.C. § 112(f)................................................................................................................. 1, 13, 20

35 U.S.C. § 132............................................................................................................................. 13

## I.    INTRODUCTION

Plaintiff Marlowe Patent Holdings LLC ("Marlowe") and Defendant For Motor Company ("Ford") dispute the meaning of the terms "interface" and "device presence signal".[1]

Marlowe contends that the term "interface" should be construed as "a device having a microcontroller" and not be construed as "a device separate from the vehicle and car stereo."[2] Marlowe believes that because intrinsic evidence can resolve the claim construction, extrinsic evidence is not necessary.

Marlowe contends that the term "device presence signal" should be construed as "a signal indicating an audio or video device is present" and not be construed only as "a signal indicating that a CD player is present." Marlowe believes that because intrinsic evidence can resolve the claim construction, extrinsic evidence is not necessary.

Marlowe and Ford agree that claim elements having express "means for" term must be construed pursuant to 35 U.S.C. § 112(f) to cover the corresponding structure disclosed in the specification. Marlowe contends that corresponding structure was disclosed in the specification; however; Ford contends that corresponding structure for all but one was not disclosed in the specification.

Marlowe has alleged that the following claims of the '786 patent are being infringed by Ford's Sync: 1, 6, 57, 58, 60, 61, 62, 63, 64, 65, 86, 87, 88, 89, 90, 91, 92, 93, 94, 97, and 98. (Dkt. 90, pg. 3). Claims 87, 92, 93, 94, 97 and 98 have express "means for" term. (Exh. A).

---

[1] Please see the Amended Joint Claim Construction Statement (Dkt. No. 89), showing the agreed and the disputed terms between the parties.

[2] Marlowe believes that in order to construe the term "interface," this term must be looked at in view of the parties agreed terms "car stereo" or "car radio" because Ford's construction of the term "interface" relates to the term "car stereo".

## II.     FACTUAL BACKGROUND

### A.     Marlowe's '786 Patent.

The '786 patent relates to an audio device integration system, where 99 claims were issued under the '786 patent. (Exh. A). The '786 patent pertains to an audio device integration system that enables after-market audio products such as a CD player, a CD changer, a MP3 player, a satellite receiver, a digital audio broadcast receiver, and other auxiliary sources to be connected to, operate with, and be controlled from, an existing stereo system in an automobile. (Exh. A, generally and Abstract).

The patent discloses and claims an interface, which can be a part of the car stereo, as defined in the '786 patent, and thereby be a part of the vehicle, and related technologies that allow an external audio device, not designed to go in an automobile, to play music through, and be controlled from, a car stereo. (Exh. A, generally; Col. 4, lines 47-67; Col. 5, lines 1-13). The audio device is integrated to the car stereo via the patented interface. (Exh. A, Col. 4, lines 47-49).

The specification of the '786 patent translates control commands between the "language" understood by the car stereo, and the "language" understood by the audio device, e.g., an MP3 player such as an iPod. (Exh. A, generally and Abstract). A user can plug his or her iPod into the patented interface, and select songs, adjust volume, and etc. directly from the car stereo. (Exh. A). Further, playlists and other information from the iPod may be displayed on the car stereo's display. (Exh. A). And, the audio from the audio device can be played out through the car stereo's audio system. (Exh. A).

One important aspect of the '786 patent relates to a "device presence signal." (Exh. A, specification). The patented interface generates a device presence signal. (Exh. A).

Also, prior art audio devices that were made for installation in an automobile typically generated and transmitted a device presence signal to the car stereo, which let the car stereo know there was an audio device connected to it, and kept the car stereo in a state responsive to signals from the audio device. (Exh. B, pg. 6; Exh. C, generally and ¶ 34). Such a signal was necessary for the car stereo to control an audio device connected to an input port of the car stereo so that the car stereo knows that such an audio device is connected to be used. These prior art automobile audio devices were typically designed to be mounted in the trunk, under the front seat of the vehicle, or elsewhere in the car. (Exh. D). Such prior art devices were designed specifically for the installation in an automobile.  As such, these prior art audio devices would generate and transmit the necessary device presence signal to the car stereo. (Exh. E and F).  In prior art systems, the device presence signal and the audio signals were transmitted from the audio device to the car stereo. (Exh. E and C).

The '786 patent discusses the problem of allowing audio devices that are not designed for an automobile, and thus alien to the environment of an existing car stereo, to be compatible and be used by the car stereo. (Exh. A, Col. 4, line s65-67). Portable audio devices, such as iPod, iPhone, MP3 player and etc., typically designed to be carried about on one's person, do not generate a device presence signal so that they are not compatible with the car stereo because the car stereo would not recognize these devices. (Exh. F). However, with the patented interface, these audio devices become compatible with the car stereo. Prior art interfaces did not generate a device presence signal and alien external audio or video devices have no device presence signals. (Exh. F).

To solve this problem, the '786 patented interface generates a device presence signal to maintain the car stereo in a state responsive to processed data and audio signals. (See, e.g., Exh. A, Col. 12, lines 25-35; Claim 6, Col. 22, lines 14-16).

## III.   ARGUMENT ON DISPUTED TERMS

### A.   CLAIM CONSTRUCTION

#### i.   LEGAL STANDARD.

Generally, claim construction is a legal question to be determined exclusively by the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983-84 (Fed. Cir. 1995) (*en Banc*), *aff'd*, 517 U.S. 370 (1996). To determine the proper meaning of a claim term, a court must consider the intrinsic evidence, that is, the claims, the written description, and, if in evidence, the prosecution history. *Digital Biometrics, Inc. v. Indentix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998). A court commits error if it uses extrinsic evidence, such as expert testimony, unless the intrinsic evidence is insufficient to construe the claim. *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 705 (Fed. Cir. 1997); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996). "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point out and distinctively claim the subject matter which the patentee regards as his invention.' 35 U.S.C. § 112, ¶ 2". *Texas Digital Systems Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1201-02 (Fed. Cir. 2002), *citing, Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *see also, Vitronics Corp.*, 90 F.3d at 1582.

#### ii.   INTERFACE.

The parties disputed term and their proposed construction are shown below.

4

| Term | Marlowe's Proposed Construction | Ford's Proposed Construction |
|------|--------------------------------|------------------------------|
| Interface | A device including a microcontroller | A device separate from the vehicle and car stereo |

As an initial matter, even Ford does not dispute that Marlowe's proposed construction that the claimed "interface" is a device that includes a microcontroller.[3]

Simply, Ford's proposed claim construction for Marlowe's claimed "interface" is to avoid infringing the '786 patent. (Dkt. 90, pg. 12). If Ford's proposed construction is accepted, then Ford believes that its Sync would avoid infringing the '786 patent because its Sync cannot be the patented interface since Sync is a part of the "car stereo" or "car radio", as defined in the '786 patent.[4]

Ford states in its brief that the main dispute between the parties is whether the interface can be part of the car stereo and the vehicle, or whether it is separate from the car stereo and vehicle itself. Ford's understanding of the dispute is misplaced because the '786 patent's use of the terms "interface" and "car stereo" is consistent with Marlowe's proposed construction. Ford added those limitations in its construction to avoid infringement.

The language of the '786 patent is consistent with Marlowe's proposed claim construction. Further, Ford's proposed claim construction for the claimed "interface" impermissibly limits the

_____

[3] See Defendant Ford Motor Company's Claim Construction Brief, dated July 11, 2014. (Dkt No.: 90, pg. 7).

[4] The '786 patent discusses "car stereo" and "car radio", at column 5, lines 1 to 14, stated hereafter in its full text:   "Also, as used herein, the terms "car stereo" and "car radio" are used interchangeably and are intended to include all presently existing car stereos and radios, such as physical devices that are present at any location within a vehicle, in addition to software and/or graphically-or display-drive receivers. An example of such a receiver is a software-driven receiver that operates on a universal LCD panel within a vehicle and is operable by a user via a graphical user interface displayed on the universal LCD panel. Further, any future receiver, whether a hardwired or a software/graphical receiver operable on one or more displays, is considered within the definition of the terms "car stereo" and "car radio," as used herein, and is within the spirit and scope of the present invention."

scope of the "interface" because the interface mentioned in the '786 patent does not specify whether the interface is internal or external to the car stereo or vehicle, i.e., the '786 patent does not limit whether the interface is a device separate from the vehicle and car stereo. Simply, Marlowe states that if an interface is integrated to a car stereo, the interface becomes a part of the "car stereo," based on the definition of the "car stereo" of the '786 patent. It is consistent that, as defined in the '786 patent, the "car stereo" can include an interface, depending on its configuration, just like Ford's car stereo having a Sync found in its vehicles. The "car stereo" of the '786 patent is defined such that its configuration determines whether an interface is a part of the car stereo. How can an interface not be a part of the car stereo when it is a physical device that is present at any location within a vehicle and when the interface is specifically designed to be part of the car stereo?

Ford uses Figure 2A from the '786 patent to indicate that the interface (20) is separate from the car radio (10).[5] This figure, like other figures found in the '786 patent, is an illustrative block diagram showing various connections amongst various components. In this particular figure, there are also other blocks showing the display (13) and control panel buttons (14), being connected to the car radio (10). Although the display (13) and the control panel buttons (14) are shown in different blocks than the car radio (10), just like the interface (20), they are clearly and expressly stated in the '786 patent as being part of the car radio.[6] The '786 patent expressly states that the blocks (13) and (14) are part of the car radio (20), even though they are in different blocks. If

---

[5] FIG. 2A is found in Ford's Claim Construction Brief (Dk. No. 90, page 9) or the '786 patent (Sheet 1) or (Exh. G).
[6] The '786 patent states that "In a preferred embodiment of the present invention, the car radio 10 includes a display 13 (such as an alphanumeric, electroluminescent display) for displaying information, and a plurality of control panel buttons 14 that normally operate to control the radio 10." (Col. 5, lines 45-49).

Ford's argument is accepted using this figure to determine that the interface (20) is separate from the car radio (10) because they are in different blocks, then blocks (13) and (14) must also be separate from the car radio (20). However, this is not the case. A car radio can include an interface or not based on its configuration, because the language of the '786 patent's use of the car radio and the interface is consistent.

Also, Ford's proposed construction for the term "interface" just does not make any sense. First, as indicated above, an interface can be a part of the car stereo, thereby making the interface to be not separate from the vehicle and car stereo. Second, there is further support from the specification. The specification defined the term "integration" or "integrated".[7] External devices are integrated to a car radio via an interface. (See Footnote [7] below). How can the interface be separate from the vehicle when the external devices are integrated to a car radio via the interface? Using Ford's proposed construction for the term "interface" would make it inconsistent with the term "car stereo," as defined in the specification.

Here, with intrinsic evidence, the construction for the term "interface" can be resolved. First, Ford agrees with Marlowe that the term "interface" is a device having a microcontroller. Second, the parties have agreed to the terms "car stereo" or "car radio" found in the '786 patent. Lastly, the '786 patent's defined terms for "car stereo" or "car radio" are used in a consistent manner as to its relationship with the term "interface." Because intrinsic evidence is able to resolve the term "interface," there is no need to look to the extrinsic evidence that Ford mentioned in its brief discussing Marlowe's "continuation-in-part" application, Marlowe's Singapore application

---

[7] "Integration" or "integrated" in the '786 patent is defined as "intended to mean connecting one or more external devices or inputs to an existing car radio or stereo via an interface, processing and handling signals and audio channels, allowing a user to control the devices via the car stereo, and displaying data from the devices on the radio." (Col. 4, lines 47-52).

and other extrinsic evidence to argue for its proposed claim construction, as the rule requires this to be so if a term can be resolved using intrinsic evidence.

However, if extrinsic evidence is being used to determine the term "interface," Marlowe states that the continuation-in-part and Singapore applications are using specific language to define the scope of their respective applications and that does not make the term "interface" found in the '786 patent to be only indicating that the interface is only a device separate from the vehicle and car stereo when the '786 patent does not limit its scope of the term "interface" to that only.

### iii.    DEVICE PRESENCE SIGNAL.

The parties disputed term and their proposed construction are shown below.

| Term | Marlowe's Proposed Construction | Ford's Proposed Construction |
|------|--------------------------------|------------------------------|
| Device presence signal | A signal indicating an audio or video device is present | A signal indicating that a CD player is present |

Ford's main thrust of its argument is that (1) "[n]owhere does the specification of the '786 patent teach or even mention generating a presence signal that indicates the presence of any device other than a CD player", that (2) device presence signal did not appear in the original application so that Ford can compare the '786 patent against *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353 (Fed. Cir. 2005) case law, and that (3) extrinsic evidence found in the specification of the '667 application support its construction.

As an initial matter, Marlowe believes that intrinsic evidence is sufficient to determine the term "device presence signal," and therefore, extrinsic evidence is not necessary.  However, if extrinsic evidence is used to construct the term, Marlowe simply states that spelling out or describing a term in a different manner is not an added language, but of same difference, i.e., saying the same thing in a different manner.

Second, Ford is trying to impermissibly limit the claim scope by indicating that the device presence signal is only limited to a signal that indicates a CD player is present.  What Ford ignores or fails to recognize is that "a signal indicating a CD player is present" is only one embodiment of the '786 patent's device presence signal. The specification specifically discusses a CD player device presence signal as one embodiment. [8] The '786 specification discusses that a device presence signal can be other device presence signal, such as MP3 player presence signal, CD changer presence signal, satellite receiver presence signal, DAB receiver presence signal, or the like, depending on which port of the car radio is hooked up to the patented interface, as mentioned in the '786 patent. [9] (Exh. H).

_____

[8] FIG. 4D of the '786 patent specifically discusses one embodiment of the invention, having "RADIO IN CD PLAYER MODE?" Block 196. The specification of the '786 patent describes FIG. 4D by indicating that "[i]n a preferred embodiment of the present invention, each of the one or more auxiliary input sources are selectable by selecting a CD disc number on the control panel of the car radio." (Col. 14, lines 54-57).

[9] At column 2, lines 29-35 of the '786 patent states as follows:  "The integration system connects to and interacts with the car stereo at any available port of the car stereo, such as a CD input port, a satellite input, or other known type of connection. If the car stereo system is an after-market car stereo system, the present invention generates a signal that is sent to the car stereo to keep same in an operational state and responsive to external data and signals."  (Col. 2, lines 29-35). Depending on which port of the car radio, the car radio would send a signal specific related to that port and the patented interface would return an expected signal specific to that port. What this passage is saying is that, for example, as one embodiment, when a patented interface is connected to the car stereo's CD input port, the car stereo sends out a signal to the patented interface through the CD input port and the patented interface sends a CD changer device presence signal back to the car stereo to maintain the car stereo in an operational state and responsive to external data and signals. (Here, the car stereo sends a signal to the patented interface and if the car stereo receives an expecting CD changer device presence signal, then the car stereo is maintained in this operational state in the CD changer mode.  For example, if a user presses a CD changer button of the car stereo, the patented interface keeps the car stereo in the CD changer state when the patented interface sends the expecting return CD changer device presence signal). For example, when Col. 2, lines 29-35 is read within the scope of the '786 patent, another embodiment of the '786 patent is that when a patented interface is connected to the car stereo's satellite input port, the car stereo send out a signal to the patented interface through the satellite input port and the patented interface sends a satellite input device presence signal back to the car stereo to maintain the car stereo in an operational state and responsive to external data and signals. (Here, the car stereo sends a signal to the patented interface and if the car stereo receives an expecting satellite input device presence

Figure 4B of the '786 patent is an example of one embodiment of the patented interface, as discussed at Col. 13, lines 7-10. Block 136 of Figure 4B questions whether a radio is in a CD player mode by stating "RADIO IN CD PLAYER MODE?" and if yes, Block 140 indicates that the patented interface "CONTINUOUSLY TRANSMIT CD PLAYER PRESENCE SIGNAL" to keep the car radio in this operational state.[10] Now, please note that Block 136 of Figure 4B questions whether a radio is in a CD player mode. (This is one embodiment having Block 136 to state: "RADIO IN CD PLAYER MODE?")

The question mark in Block 136, in conjunction with the disclosure at Col. 2, line 29-35 (See footnote [9]), is highly instructive. The Block 136 could have been easily replaced with the words "RADIO IN SATELLITE INPUT MODE?" Then, the Block 140 would then be replaced with the words "CONTINUOUSLY TRANSMIT SATELLITE INPUT PRESENCE SIGNAL." (Now, this would have been another embodiment of the '786 patent, being shown in a figure.) Moreover, the '786 patent clearly discloses that other device presence signals, depending on which port of the radio that the patented interface is connected. (Exh. A, Col. 2, lines 29-35). The Federal Circuit has repeatedly held that even when the specification describes only a single embodiment, the claims will not be limited to that embodiment unless there is a clear and unambiguous disavowal of claim scope. *Liebel Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir.

---

signal, then the car stereo is maintained in this operational state in the satellite input mode. For example, if a user presses a satellite input button of the car stereo, the patented interface maintains the car stereo in the satellite input state when the interface sends the expecting return satellite input device presence signal). (See, also, e.g., Exh. A, Abstract, Col. 1, lines 5-10; Col. 2, lines 22-26; Fig. 4b, blocks labeled 136 and 142; Fig. 4C, blocks labeled 166 and 172).

[10] In Figure 4B, the car radio is in a CD player mode state illustratively, being one embodiment of the invention. The patented interface is therefore connected to the CD player port. Block 138 is indicating that a MP3 player is connected to the patented interface. Now, please note that an after-market audio device Block 138 being connected to the patented interface here could also be iPod, iPhone, CD player, CD changer or other audio device, and not just the MP3 player. (Exh. A, abstract; e.g., Col. 4, lines 27-32; Exh. H).

2004); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1091 (Fed. Cir. 2003); *Apex Inc. v. Rarotam Computer, Inc.*, 325 F.3d 1364, 1377 (Fed. Cir. 2003).

Further, the specification of claim 49 expressly mentions that the device presence signal is based upon the car stereo. (Exh. A, Col. 25, lines 52-53). Here, the '786 patent did not limit the device presence signal only to the CD player presence signal. Rather, it explicitly disclosed that in addition to the CD input port used for the CD player presence signal, it also disclosed the "satellite port, or any other known type of connection." (Exh. A, Col. 2, lines 29-35). So, depending on which port of the car stereo is being connected to the patented interface, the patented interface will return a corresponding device presence signal back to the car stereo for that port.  This is evident because the claims themselves disclosed a device presence signal, and not limited themselves to a CD player presence signal. (Exh. A., '786 patent's claims).

Further, the specification of the claims 6 (discussing hooking up an after-market audio device external), 57 (discussing hooking up a MP3 player), 66 (discussing hooking up a satellite radio receiver), 77 (discussing hooking up a DAB receiver), 86 (discussing hooking up a video device) and 91 (discussing hooking up a portable audio device) all discusses a device presence signal. [11] Further, their dependent claim naturally discusses device presence signals as well.

---

[11] These claims discuss the other end of the connection between the patented interface and the audio/video devices.  The device presence signal found in these claims did not limit itself to a CD player presence signal. The claims themselves left open as to which port of the car stereo the patented interface would be connecting to. If the patented interface connects to the car stereo's CD player port, the patented device would be sending an expecting CD player device presence signal to maintain the car stereo in an operational state for that port.  If the patented interface connects to the car stereo's satellite receiver port, the patented device would be sending an expecting satellite receiver device presence signal to maintain the car stereo in an operational state for that port, and so on. The claims did not limit themselves to just a CD player presence signal, as indicated by Ford's proposed construction. Marlowe's claim construction for a device presence makes sense in that a "device presence signal" is a signal indicating an audio or video device is present.

Further, the claims specifically discuss a device presence signal with respect to audio or video devices.

Ford's expert named Thomas G. Matheson states in its expert report that "[t]he term "device presence signal" does not appear anywhere in the '786 patent's specification." (Dkt. 90-5, ¶ 4). This statement is absolutely incorrect and therefore, Ford's statement is misleading and false. Claims are part of the specification.[12] 35 U.S.C. § 112(b). The '786 patent uses the term "device presence signal" in the specification. They are littered in most of the claims themselves. Also, a specific embodiment of a device presence signal is also mentioned throughout the specification of the '786 patent.

Ford, in its brief, further states that "[n]owhere does the specification of the '786 patent teach or even mention generating a presence signal that indicates the presence of any device other than a CD player. (Dkt. No. 90, pgs. 12-13). As discussed in this brief, that is not the case.  Further, there is no limiting language in the '786 specification to have the patented device presence signal to be only limited to a CD player device presence signal.

Ford, in its brief, states that the term "device presence signal" (1) did not appear in the original application, (2) was added during examination, and (3) does not have a commonly understood meaning. (Dkt. No. 90, pg. 13, 2nd ¶).

Ford's statements (1) and (2) are factually inaccurate. Marlowe's originally filed claim 47 called out for a generic device "presence signal" based on the car stereo (Exh. I, pg. 54). It was there originally. And, a preliminary amendment, prior to any examination of the application by the USPTO, was filed explicitly reciting a device presence signal and not a CD player signal (Exh. J,

---

[12] 35 U.S.C. § 112(b) states:  "The specification shall include with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."

claim 55 ("generating a device presence signal and transmitting the signal to the car stereo to maintain the car stereo in an operations state; also, Claims 63, 72, 81). Had the device presence signal limitation was not supported in the originally filed patent application, the USPTO examiner would have rejected it as new matter. 35 U.S.C. § 132; *Enzo Biochem Inc. v. GenProbe*, 323 F.3d 956 (Fed. Cir. 2002).

As for Ford's third statement that a device presence signal is not a commonly understood meaning, the parties have narrowed the construction and Marlowe believes that its construction has proper support, i.e., the specification of the '786 patent supports Marlowe's construction[13] ("a signal indicating an audio or video device is present") over than Ford's construction ("A signal indicating that a CD player is present"). Ford's construction is only one embodiment of the '786 patent. The specification of the '786 patent supports a broader scope of the term, as indicated by Marlowe's proposed construction and shown in the specification.

## B.    MEANS PLUS FUNCTION TERMS

The parties agrees that claims 87 and 92 of the '786 patent contain limitations which recite function.  The issue here is whether the specification shows corresponding structure for the claims that use the mean plus function.

### i.    LEGAL STANDARD.

The construction of mean plus function limitation is governed by 35 U.S.C. § 112(f).  As indicated in Ford's brief, the Court needs to identify the function being performed and then

---

[13] It should be noted that a "device presence signal" should not be construed in a vacuum.  This term that is found in the claims are related by what follows, i.e., for example, claim 6 states: "a device presence signal for maintaining the car stereo in a state responsive to processed data and audio signals." And, for example, claim 86 discusses about video signals. Therefore, a "device presence signal" is a signal indicating an audio or video device is present.

determine the structure recited in the specification for performing that function. *Medtronic, Inc. v. Adv. Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1310 (Fed. Cir. 2001).  If the specification does not contain a corresponding structure, the claim is invalid as indefinite. *Ergo Licensing, LLC v. Carfusion 303*, Inc., 673 F.3d 1361, 1363 (Fed. Cir. 2012).

For a special purpose computer-implemented means-plus-function limitation, the Federal Circuit has required the specification must disclose an algorithm for performing the claimed function. *Aristocrat Techs. Australia Pty Ltd. V. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  Applicant may express an algorithm in any understandable terms including as a mathematical formula, in prose, in a flow chart, or "in any other manner that provides sufficient structure." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).  A claim is considered indefinite if it does not reasonably apprise those skilled in the art of its scope.  *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 460 F.3d 1377, 1383-84 (Fed. Cir. 2005). If one skilled in the art would be able to identify the structure, material or acts from the description in the specification for performing the recited function, then the requirements of 35 U.S.C. § 112(b) are satisfied. *In re Dossel*, 115 F.3d 942, 946-47 (Fed. Cir. 1997). Compliance with the written description requirement is a question of fact which must be resolved on a case-by-case basis. *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1560 (Fed. Cir. 1991).

### ii. THE FUNCTIONAL LIMITATIONS.

The parties have agreed that the '786 patent contains several functional limitations as shown in the table below.

| Term | Claim | Function | Corresponding Structure |
|------|-------|----------|--------------------------|
|      |       |          |                          |

| (1) means for converting video information into a format compatible with the car stereo | 87 | converting video information into a format compatible with the car stereo | Abstract; Fig 4a,4b,4c; Col.2, lines 22-52; Col.1, lines 36-44; Col.12, lines 14-67(fig4a); Col.13, lines 1-67(fig4b,4c) : Col.14, lines 1-33 (fig4c); Col.16, lines 46-67 (fig4g) : Col.17, lines 1—67 (table1) : Col.18, lines 1-4(table1) : Col.18, lines 5-67(table2) : Col.19, lines 1-4(table2); Col.20, lines 5-54(fig6,4d) Claims 51, 53, and 87 |
|---|---|---|---|
| (2) first pre-programmed means for generating a device presence signal | 92 | generating a device presence signal to the car stereo to maintain the car stereo in an operational state | Abstract; Summary; Col.1, lines 13-67 : Col.2, lines1-18; Col.2, lines 22-52; Col.4, lines 27-67; Col.12, lines 14-67(fig 4a); Col.13, lines 1-67(fig 4b,4c)  : Col.14, lines 1-31 fig4b,4c) : Col.14, lines 32-53(fig4d) ; Col.15, lines 24-67(fig 4a,4d, 4e) ; Col.16, lines 1-67(fig 4b,c,d,g,f ) : Col.17, lines 1-31 Col.19, lines 4-67 (fig 4c,fig 5) : Col.20, lines 1-67(fig 4a,b,c,d) : Col.21, lines 1-24(fig7a,b) Claims 1, 49, 57, 66, 76, 86, 92, and 99 |
| (3) first pre-programmed means for . . . transmitting the signal to the car stereo to maintain the car stereo in an operational state | 92 | transmitting the signal to the car stereo to maintain the car stereo in an operational state | Abstract; Fig 4a,4b,4c; Col.2, lines 22-52; Col.1, lines 36-44; Col.12, lines 14-67(fig4a); Col.13, lines 1-67(fig4b,4c) : Col.14, lines 1-33(fig4c); Col.18, lines 63-67(table2) ; Col.19, lines 1-3(table2) Col.17, lines 22-67(table1) ; Col.18, lines 1-4(table1) ; Col.18, lines 5-67(table2) ; Col.18, lines 63-67(table2) ; Col.19, lines 1-3(table2) Col.19, lines 1-4(table2) ; Col.20, lines 44-54(fig6,4d) ; Claims 1, 25, 49, 57, 60, 66, 69, 76, 76, 79, 86, 90, 91, 92, and 99 |

| (4) means for remotely controlling the portable audio device using the car stereo by receiving a control command from the car stereo in a format incompatible with the portable audio device | 92 | remotely controlling the portable audio | Abstract;<br>Summary;<br>Col.2, lines 22-67 : Col.3, lines 1-4;<br>Col.4, lines 27-67;<br>Col.6, lines 1-67(fig2b,2c,2d) : Col.7, lines 1-67(fig2e-2h) : Col.8, lines 1-67(fig1-2h,3a-3d) : Col.9, lines 1-67(fig3b);<br>Col.11, lines 19-46(fig3d);<br>Col.12, lines 14-67(fig4a);<br>Col.13, lines 1-47(fig4b);<br>Col.13, lines 48-67(fig4c) : Col.14, lines 1-31(fig4c);<br>Col.17, lines 31-67(table1) : Col.18, lines 1-62(table2);<br>Col.20, lines 55-67 : Col.21, lines 1-24 (fig. 7a,7b)<br>Claims 1, 25, 33, 34, 35, 36, 37, 42, 50, 57, 60, 66, 69, 76, 79, 90, 91, and 92 |
| (5) means for remotely controlling the portable audio device using the car stereo by . . . processing the control command into a formatted control command compatible with the portable audio device | 92 | remotely controlling the portable audio | Abstract; Fig5; Col.1, lines 36-44, Col.3; lines 56-67(Fig4a,b,c,d) ; Col.4, lines 1-3 (fig4e);<br>Col.4, lines 4-7(fig4f); Col.4, lines 8-10(fig4g); Col.4, lines 11-14(fig5); Col.4, lines15-18(fig6);<br>Col.4, lines 25-67; Col.5, lines 38-67(fig2a); Col.6, lines 1-24(fig2b); Col.6, lines 25-43(fig2c);<br>Col.6, lines 44-67(fig2d) : Col.7, lines 1-22 (fig2e-2h); Col.7, lines 23-37(fig2e); Col.7, lines 38-49(fig2f); Col.7, lines 50-61(fig2g); Col.8, lines16-64(fig3a-3d,1-2h,); Col.9, lines 45-67(fig3b);<br>Col.10, lines 49-67(fig3c) : Col.11, lines 1-3(fig3c) Col.11, lines 4-46 (fig3c, 3d); Col.12, lines 4-67(fig4a-6);<br>Col.13, lines 1-67(fig4b, 4c) : Col.14, lines 1-31(fig4c) ;<br>Col.14, lines 32-67 (fig4d) : Col.15,lines1-11 (fig4d); Col.15, lines12-67 (Fig4d, 4e);<br>Col.16, lines1-67(fig4f,4g); Col.17,lines1-21<br>Col.17,lines 22-67(4d,Table1) : Col.18,lines1-13<br>Col.18,lines14-67; (4d,Table2) : Col.19,lines1-3;<br>Col.19, lines4-43(fig5);<br>Col.19, lines44-67(fig4d) : Col.20, lines1-4<br>Col.20, lines5-18(fig6,4d);<br>Col.20, lines19-43(fig4a,b,c)<br>Claims 1, 7, 8, 9, 10, 25, 26, 33, 43, 44, 57, 60, 61, 62, 69, 70, 71, 72, 79, 80, 81, 82, 90, 91, and 92 |

16

| (6) means for remotely controlling the portable audio device using the car stereo by . . . transmitting the formatted control command to the portable audio device for execution thereby | 92 | remotely controlling the portable audio [Ford agrees that there is a corresponding structure for this "means for" term] | Abstract; Fig 4a,4b,4c; Col.2, lines 22-52; Col.1, lines 36-44; Col.12, lines 14-67(fig4a); Col.13, lines 1-67(fig4b,4c) : Col.14, lines 1-33(fig4c); Col.18, lines 63-67(table2) ; Col.19, lines 1-3(table2) Col.17, lines 22-67(table1) ; Col.18, lines 1-4(table1) ; Col.18, lines 5-67(table2) ; Col.18, lines 63-67(table2) ; Col.19, lines 1-3(table2) Col.19, lines 1-4(table2) ; Col.20, lines 44-54(fig6,4d) ; Claims 1, 25, 49, 57, 60, 66, 69, 76, 76, 79, 86, 90, 91, 92, and 99 |
| --- | --- | --- | --- |
| (7) means for transmitting audio from the portable audio device to the car stereo | 92 | transmitting audio from the portable audio device to the car stereo | Abstract; Fig 4a,4b,4c; Col.2, lines 22-52; Col.1, lines 36-44; Col.12, lines 14-67(fig4a); Col.13, lines 1-67(fig4b,4c) : Col.14, lines 1-33(fig4c); Col.18, lines 63-67(table2) ; Col.19, lines 1-3(table2) Col.17, lines 22-67(table1) ; Col.18, lines 1-4(table1) ; Col.18, lines 5-67(table2) ; Col.18, lines 63-67(table2) ; Col.19, lines 1-3(table2) Col.19, lines 1-4(table2) ; Col.20, lines 44-54(fig6,4d) ; Claims 1, 25, 49, 57, 60, 66, 69, 76, 76, 79, 86, 90, 91, 92, and 99 |

Ford agrees in its brief that there is a corresponding structure found in the '786 patent for the term (5), as shown in the above table. Therefore, the remaining issue for the terms are numbers (1), (2), (3), (4), (6) and (7) in the above table.

### iii.    CORRESPONDING STRUCTURE.

17

As an initial matter, the specification of the '786 patent discloses algorithms by using text, description, prose, flow chart, table, diagram, figure, code portion and other manners in combination to provide sufficient structure for the claim elements having the mean plus function terms.[14] With the disclosure in the specification of the '786 patent, a person skilled in the art is reasonably apprised of its scope, making the functional claim elements to be not indefinite.

The numbered terms (4), (5) and (6) mentioned in the table above have the same function, i.e., remotely controlling the portable audio by receiving, processing and transmitting control command signals. Ford agreed that the number term (5)'s corresponding structure was disclosed in the '786 patent. Because the numbered terms (4) and (6) have the same function as the number term (5), the corresponding structure for the numbered terms (4) and (6) is therefore disclosed as well in the '786 patent.[15]

The numbered term (1)'s function is "converting video information into a format compatible with the car stereo". Video information is data signals. As mentioned in footnotes [14]

---

[14] The '786 patent expressly provides two source codes in Tables 1 and 2 (Cols. 17 and 18) and states that: "While the above code portions are shown using assembler language, it is to be expressly understood that any low or high level language known in the art, such as C or C++, could be utilized without departing from the spirit or scope of the invention.  It will be appreciated that various other code portions can be developed for converting signals from any after-market or OEM car stereo for use by an after-market external audio device, and vice versa. (Col. 18, line 63:Col. 19, line 3).

[15] The numbered terms (4), (5), and (6) function for remotely controlling portable audio device is to receive, process and transmit control command signals. The patented interface receives control command signals from the radio. The patented interface processes the control command signals received from the radio. After the patented interface processes the control command signals, it transmits the signals that is stored in an output buffer for transmission. (Col. 17, line 22:Col. 18, line 4 and Table 1).  The Table 1 found in the '786 patent shows a sample code portion for converting control signals from a BMW car stereo into a format understandable by a CD changer. (Col. 17, lines 31-61). In conjunction, Table 2 found in the '786 patent shows a sample code portion for converting data from a CD changer into a format understandable by a BMW car stereo. (Col. 18, lines 15-49). As shown in Col. 18, line 48 of the source code, it states "ready to send", i.e., the patented interface is transmitting thereafter.

and [15], Tables 1 and 2, and their entailing discussion found in the '786 patent are for converting control signals and for converting data into a format understandable by a device. Therefore, the corresponding structure for the numbered term (1) is provided in the '786 patent.  The text of the patent goes on to state that "[i]t will be appreciated that various other code portions can be developed for converting signals from any after-market or OEM car stereo for use by an after-market external audio device, and vice versa. (Col. 18, line 76:Col. 19, line 3). Based on the Tables 1 and 2 the corresponding structure cited in the table found above in this brief, a person having an ordinary skilled in the art is able to identify the structure for the means plus function claimed elements.

The numbered terms (2) and (3)'s function are "generating a device presence signal and transmitting the signal to the car stereo to maintain the car stereo in an operational state." In conjunction with the Figure 4a (flow chart) of the '786 patent and the text found at Col. 12, lines 15-36, along with Tables 1 and 2 of the '786 patent and the references cited in the table above in Section B(ii) of this brief, a corresponding structure is found in the '786 patent.

The number term (7)'s function is "transmitting audio from the portable audio device to the car stereo." The corresponding structure is found in the '786 patent, as shown in footnotes [14] and [15] relating to the discussion on transmitting portion, Section B(iii) of this brief and the references cited in the table above in Section B(ii) of this brief.

Based on the specification, a person having an ordinary skilled in the art is able to identify the structure for the means plus function claimed elements.

Here, the corresponding structure is found in the '786 patent in prose, flow charts, figures, code portions, and claims, in combination, to provide sufficient corresponding structure for the claim elements having the mean plus function terms.

**IV.   CONCLUSION.**

Based on the foregoing, Marlowe respectfully requests that this Court adopt Marlowe's proposed constructions and further hold claims 87 and 92 and its dependent claims of the '786 patent valid under the 35 U.S.C. § 112(f).

Respectfully submitted,

Dated: July 24, 2014

_/s/  Kun Cho_____

Kun Cho (KC4804)
Law Office of Kun Cho LLC
385 Sylvan Avenue, Suite 20
Englewood Cliffs, NJ 07632
(201) 484-8282
Email: kun@kuncholaw.com
Attorneys for Plaintiff Marlowe Patent Holdings LLC

## CERTIFICATION OF SERVICE

I certify that I electronically filed MARLOWE PATENT HOLDINGS LLC'S
CLAIM CONSTRUCTION BRIEF with the Clerk of the Court for the District of New Jersey
using the ECF System which will send notice of this filing to all registered participants of the
ECF System.


                                    Law Office of Kun Cho LLC
                                    Attorneys for Plaintiff Marlowe Patent Holdings LLC

Dated: July 24, 2014

                                        /s/ Kun Cho
                                    _____
                                    Kun Cho (KC4804)
                                    Law Office of Kun Cho LLC
                                    385 Sylvan Avenue, Suite 20
                                    Englewood Cliffs, NJ 07632
                                    (201) 484-8282
                                    Email: kun@kuncholaw.com
                                    Attorneys for Plaintiff